UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT FROMER,<br>        Plaintiff,<br><br>        v.<br><br>COMCAST CORP., et al.,<br>        Defendants. | No. 3:09cv2076 (SRU) |

## RULING ON MOTION TO COMPEL ARBITRATION

This case involves a putative class action brought by a Comcast subscriber who is attempting to sue the defendants under the Connecticut Unfair Trade Practices Act ("CUTPA") and the Sherman Act.  An arbitration agreement exists between the two parties, and at issue here is whether the class action waiver provision of that agreement is enforceable.

At the time the parties wrote their briefs, there was some question whether the Second Circuit's doctrine on class arbitration had been overruled by the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011).  Two days before the oral argument on the motion to compel, the Second Circuit issued an opinion holding that the Second Circuit's doctrine had <u>not</u> been overruled.  *In re American Express Merchants Litig.*, 667 F.3d 204 (2d Cir. 2012) ("*American Express III*").

During the hearing, I granted the parties' request to submit supplemental briefing in light of *American Express III* and the issues raised during oral argument.  The parties submitted additional briefs, which I have reviewed.  For the reasons that follow, the defendants' motion to compel arbitration, doc. 57, is **DENIED**.

**I.    Background**

The plaintiff, Robert Fromer, is a customer of Comcast Corporation, Comcast of Connecticut, Inc., Comcast Cable Communications, LLC, and Comcast Cable Communications Holdings, Inc. (collectively, "Comcast"). Fromer first subscribed to Comcast's cable television service on October 21, 1999, and to its high-speed internet service on April 18, 2002. Defs.' Mot. to Compel Arbitration ("Defs.' Mot. to Compel"), Ex. 1 at ¶ 5. In July 2007, Comcast included an arbitration notice along with Fromer's monthly bill. *Id.* at ¶ 7; Defs.' Mot. to Compel, Ex. A.

On July 26, 2007, Fromer began subscribing to Comcast Digital Voice. Defs.' Mot. to Compel, Ex. 1 at ¶ 9. When Comcast connected Fromer's Digital Voice service, it installed an embedded media terminal adapter ("eMTA").[1] *Id.* at ¶ 10. At that time Comcast also gave Fromer a work order. *Id.* The work order stated:

> If this Work Order relates to the initial installation of services, I acknowledge receipt of Comcast's Welcome Kit(s) which contain the Comcast subscriber agreement(s), the Comcast subscriber privacy notice(s) and the other important information about the service(s). I agree to be bound by the Comcast subscriber agreement(s) which constitute the agreement(s) between Comcast and me for the service(s).

Defs.' Mot. to Compel, Ex. B at 1. The welcome kit included an arbitration agreement. Defs.' Mot. to Compel, Ex. C at 20-22.

In March 2008, Comcast included a Subscriber Agreement with Fromer's monthly bill. Defs.' Mot. to Compel, Ex. 1 at ¶ 14. The 2008 Subscriber Agreement also contained an arbitration clause. Defs.' Mot. to Compel, Ex. D at 9-11. The arbitration agreement provided:

> If you have a Dispute (as defined below) with Comcast that cannot be resolved through the informal dispute resolution process described in this Agreement, you

---

[1] "An eMTA is a device that allows a Digital Voice subscriber to make phone calls, as well as to access the Internet for data services, over a HSI [high-speed internet] connection." *Id.* at ¶ 10.

or Comcast may elect to arbitrate that Dispute in accordance with the terms of this Arbitration Provision rather than litigate the Dispute in court.

*Id.* at 9.  Under the agreement, a "dispute" is defined as:

> [A]ny dispute, claim or controversy between you and Comcast regarding any aspect of your relationship with Comcast that has accrued or may thereafter accrue, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence or any other intentional tort), or any other legal or equitable theory.

*Id.*  The agreement also said that the arbitrators were to determine "the validity, enforceability or scope of this Arbitration Provision (with the exception of the enforceability of the class action waiver clause provided in paragraph F(2))." *Id.*

The arbitration agreement contained an opt-out provision:

> IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MUST NOTIFY COMCAST IN WRITING WITHIN THIRTY (30) DAYS OF THE DATE THAT YOU FIRST RECEIVE THIS AGREEMENT . . . .  YOUR DECISION TO OPT OUT OF THIS ARBITRATION PROVISION WILL HAVE NO ADVERSE EFFECT ON YOUR RELATIONSHIP WITH COMCAST OR THE DELIVERY OF SERVICES TO YOU BY COMCAST.

*Id.* at 10.

Additionally, the arbitration agreement contained a class action waiver:

> THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS THE STATUTE UNDER WHICH YOU ARE SUING PROVIDES OTHERWISE.

*Id.*  "If the class action waiver clause is found to be illegal or unenforceable, the entire Arbitration Provision will be unenforceable, and the dispute will be decided by a court." *Id.* at 11.

On December 21, 2009, Fromer brought a class action against Comcast alleging (1) a violation of the Sherman Antitrust Act for unlawful bundling of the DV service with the eMTA modem, and (2) violation of CUTPA.  Doc. 1.  Comcast has now filed a motion to compel arbitration on both counts.  Doc. 57.

**II.  Discussion**

A.  The Arbitration Agreement and the Federal Arbitration Act Govern These Claims

Fromer does not dispute that both the Sherman Act and the CUTPA claims fall within the bounds of the arbitration agreement.  That agreement allows for arbitration of any dispute, claim, or controversy between Fromer and Comcast regarding any aspect of Fromer's relationship with Comcast; it is clear that the claim of unfair bundling falls within the reach of the arbitration agreement.  It is also clear that the Federal Arbitration Act ("FAA") applies here, because this is a contract "evidencing a transaction involving commerce."  9 U.S.C. § 16(2).

Fromer also does not allege that the arbitration agreement was procedurally unconscionable.  Instead, Fromer argues that the class action waiver renders the arbitration agreement substantively unconscionable, and therefore, unenforceable.

B.  The *American Express* Line of Cases

In *Green Tea Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), the Supreme Court enforced an arbitration agreement between a financial institution and a consumer attempting to bring a claim under the Truth in Lending Act.  The plaintiff in *Green Tea* argued that,

> the arbitration agreement's silence with respect to costs and fees creates a "risk" that she will be required to bear prohibitive arbitration costs if she pursues her claims in an arbitral forum, and thereby forces her to forgo any claims she may have against petitioners.  Therefore, she argues, she is unable to vindicate her statutory rights in arbitration.

*Id.* at 90.  The Court acknowledged that "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as [the plaintiff] from effectively vindicating her federal statutory rights in the arbitral forum."  *Id.*  The Court refused to prohibit arbitration, however, because the plaintiff had failed to show that she would "bear such costs if she goes to arbitration."  *Id.*  "[W]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  *Id.* at 92.

Although the Supreme Court's pronouncement in *Green Tea* was technically dicta, it still evidenced that the Supreme Court envisioned that arbitration agreements could be voided where arbitration would be so expensive as to preclude a litigant from vindicating her rights.  The Second Circuit created a framework for employing *Green Tea* in *In re American Express Merchants' Litigation*, 554 F.3d 300 (2d Cir. 2009) ("*American Express I*").  In that case, the plaintiffs attempted to bring a tying antitrust claim under the Sherman Act and the Clayton Act; the defendant sought to compel arbitration.  The arbitration clause at issue contained a class action waiver provision.  The Second Circuit held that the class action waiver provision could not be enforced because the plaintiffs' antitrust claims could, "for all intents and purposes, only be pursued through the aggregation of individual claims, either in class action litigation or in class arbitration."  *Id.* at 317.  The Court held that the plaintiffs could not pursue their claims individually because, with expert fees, the costs of the case could be as much as $1 million, and no plaintiff could expect to receive more than $38,500.  *Id.*  Moreover, although the Sherman Act allowed a plaintiff, if successful, to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee," that would still leave the plaintiff unable to pay the expert witness fees.  *Id.* at 317-18 (internal citations omitted).  The Second Circuit also

noted that the possibility of attorneys' fees was insufficient to overcome this problem, because no plaintiff was assured of victory, and potential plaintiffs had to factor the risk of losing into their calculations of the risks and benefits of litigation.  *Id.* at 318.

Shortly after the Second Circuit issued its decision in *American Express I*, the Supreme Court decided *Stolt-Nielsen S.A. v. AnimalFeeds Int'l*, 130 S. Ct. 1758 (2010).  The plaintiff in that case had attempted to bring a class arbitration.  The arbitration agreement was silent with regard to whether class arbitrations were permissible, and the Supreme Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775.

After the Supreme Court decided *Stolt-Nielsen*, it vacated the Second Circuit's decision in *American Express I* and ordered the Second Circuit to reconsider its decision in light of *Stolt-Nielsen*.  The Second Circuit responded with *In re American Express Merchants Litigation*, 634 F.3d 187 (2d Cir. 2011) ("*American Express II*"), which reaffirmed the holding in *American Express I*.  The Court noted that "*Stolt-Nielsen* states that parties cannot be forced to engage in a class arbitration absent a contractual agreement to do so," but concluded that "[i]t does not follow, as Amex urges, that a contractual clause barring class arbitration is *per se* unenforceable." *Id.* at 193.  The Court remarked that class actions are an important vehicle for vindicating statutory rights, and that public policy concerns can bar enforcement of an agreement to arbitrate.  *Id.* at 194, 197.  Because the record made clear that the cost of arbitration could be prohibitive, the plaintiffs were effectively deprived of the statutory protections of antitrust laws, and the class action waiver was void.  *Id.* at 197-99.

A little more than a month after the Second Circuit decided *American Express II*, the Supreme Court issued *AT&T Mobility, LLC v. Concepcion*.  The Court held that California's

*Discover Bank* rule, which classified most class arbitration waivers as unconscionable, was preempted by the FAA.  In doing so, the Court discussed the dangers of class actions in the arbitration setting:  class action arbitration often involved absent parties, sacrificed arbitration's informality, and increased the risk to defendants, since "[t]he absence of multilayered review makes it more likely that errors will go uncorrected."  131 S. Ct. at 1750-52.

In response to *Concepcion*, the Second Circuit requested additional briefing on whether *American Express II* was inconsistent with *Concepcion*.  The result was *American Express III*, which again held the arbitration agreement to be invalid.  The Second Circuit first noted that *American Express II* had not been overruled by *Concepcion*:  *Concepcion* invalidated state procedures that were inconsistent with the FAA, while *American Express II* rested on a "vindication of statutory rights analysis, which is part of the <u>federal</u> substantive law of arbitrability."  667 F.3d at 213 (emphasis added) (internal citations omitted).  The Court remarked that *Stolt-Nielsen* and *Concepcion* do not "require that all class-action waivers be deemed per se unenforceable," *id.* at 214, and that *Green Tree* had not been overruled by *Concepcion*.  *Id.* at 216.  The Court then held that when an arbitration agreement effectively prevents the exercise of statutory rights, the agreement is void.  As in *American Express I* and *American Express II*, the Court held that the costs of arbitration were so high – and the amount that could plausibly be recovered so low – that rational actors were unlikely to arbitrate.  It is clear, then, that the *American Express* line of cases is still the law of the Second Circuit.

Comcast next argues that I should decline to follow *American Express III* because the Second Circuit neglected to consider that its decision violated the Rules Enabling Act.  Comcast argues that a refusal to enforce the arbitration agreement would elevate Federal Rule of Civil Procedure 23 into a substantive right.  Comcast argues that because the *American Express III*

Court did not discuss the Rules Enabling Act, I may consider whether the Rules Enabling Act prohibits the outcome reached by the Second Circuit.  This argument is misguided for two reasons.  First, the cases cited by Comcast do not stand for the proposition that a district court may decline to follow an appellate court if it determines that the appellate court's decision was incorrect for reasons not considered by the higher court.  Instead, in the main case cited by Comcast, the district court held that the Second Circuit had not reached the legal issue in question, and thus that there was no precedent to follow.  *Jackson v. Ashcroft*, No. 3:02cv1739, 2003 WL 22272593, at *3-4 (D. Conn. Sept. 28, 2003).  The Court did not hold that the Second Circuit would have ruled differently if it had reached the question at issue, but instead held that the Second Circuit had not needed to reach that question.[2]

      Moreover, the parties in the *American Express III* action discussed the Rules Enabling Act issue.  The appellees in that action, like Comcast here, argued that the invalidation of the arbitration agreement would allow Rule 23 to enlarge a substantive right, in conflict with the Rules Enabling Act.  Br. for Defs.-Appellees at 21.  The appellants countered that the question was not whether the class action wavier should be struck down because it limited a procedural right; instead, they argued that it must struck down because it limited substantive statutory rights.  "It is not the Federal Rules of Civil Procedure that place limitations upon the FAA, . . . but substantive federal statutes, such as the Sherman and Clayton Acts."  Reply Br. for Pls.-Appellants at 7-8.  Thus, although the Second Circuit did not discuss the Rules Enabling Act in

---

[2] Another case cited by Comcast, *R.B. Ventures, Ltd. v. Shane*, dealt not with precedential effect, but with collateral estoppel.  No. 91cv5678, 1999 WL 632840 (S.D.N.Y., Aug. 18, 1999).

*American Express III*, it was clearly aware of the arguments, and did not find them persuasive.[3] This court, therefore, must follow *American Express III*.

Finally, Comcast argues that, even if I am bound by *American Express III*, the facts here are distinguishable. Specifically, Comcast argues that the plaintiffs in *American Express III* could not have opted out of the arbitration agreement without terminating the entire contract. Fromer, on the other hand, had the ability to opt out of the arbitration provision of his agreement. Nevertheless, the distinction is unimportant. An inability to opt out of an arbitration agreement affects the agreement's procedural unconscionability. What is at issue in this case is whether the agreement was *substantively* unconscionable. Indeed, the Court in *American Express III* did not mention the lack of an opt-out provision as a basis of its decision. Thus, *American Express III* applies to this case.

C. Viability of Claims without Class Action

Under *American Express III*, if Fromer can show that the class action waiver here effectively precludes him from pursuing federal statutory remedies, the waiver is void.

1. *Expense of Antitrust Claims*

---

[3] Comcast also argues that the Second Circuit failed to consider the fact that its decision violated the American Rule on attorneys' fees. Under the American Rule, "each party is to bear its own costs of litigation, unmitigated by any fee-shifting exceptions." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 186 (2d Cir. 2008). According to Comcast, *American Express III* is contrary to the American Rule "because it provides access to class-action procedures and fees even though the Sherman Act – which should be the controlling statutory pronouncement on the issue – does not." Defs.' Supp. Memo. at 6. As noted above, I cannot ignore *American Express III* just because the Second Circuit did not expressly discuss the American Rule argument. In any case, Comcast's argument is unconvincing. *American Express III* does not require the parties to cover each other's fees. Instead, it merely protects access to statutory remedies.

The party who "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." *American Express III*, 667 F.3d at 217 (internal citations omitted).  Fromer has produced evidence that economic proof in his case "will require professional services costing in the neighborhood of $500,000 to $750,000."  Pl.'s Opp'n to Def.'s Supplemental Mot., Ex. 1 at 5 (Decl. of Economist Gordon Rausser).  Comcast suggests there may be evidentiary issues related to Fromer's submission.  "[D]oes the Court accept the . . . affidavit at face value?  Will there be an evidentiary hearing of battling experts?"  Def.'s Supplemental Mot. at 8.  I need not engage these questions, however, because Comcast has not introduced any countervailing evidence.

Fromer states that the monthly Comcast charges for eMTA are just a few dollars a month.  Fromer's eMTA was installed in July 2007, so he has only been billed for those charges approximately fifty-five times.  Assuming the monthly charge is approximately $3 (*see* Defs.' Mot. to Compel, Ex. F), Fromer's damages amount to $165.  The Sherman Act allows for treble damages, so Fromer could expect to recover $495.  That means Fromer can expect to recover approximately $1 for every $202 spent in litigation; in *American Express*, no plaintiff could expect to recover more than $1 for every $26 spent.

    2.  *Chance to Recover Fees*

Comcast argues that Fromer can vindicate his rights in arbitration because of the availability of attorneys' fees.[4]  Comcast is correct that the Clayton Act provides for reasonable

---

[4] The arbitration agreement itself only provides for filing fees.  The arbitration agreement provides that "Comcast will advance all arbitration filing fees and arbitrator's costs and expenses upon your written request given prior to the commencement of the arbitration.  You are responsible for all additional costs that you incur in the arbitration, including, but not limited to, attorneys or expert witnesses."  Defs.' Mot. to Compel, Ex. D at 10 (emphasis added).  Moreover, if the arbitration concludes in Comcast's favor, Fromer is required to reimburse Comcast for the arbitration fees.  *Id.*

attorneys' fees. 15 U.S.C. § 15. Nevertheless, the Second Circuit considered and rejected that very argument in *American Express III*. The Second Circuit concluded that the possibility of attorneys' fees was insufficient to convince potential plaintiffs to pursue their claims. "Even with respect to reasonable attorney's fees, which are shifted under Section 4 of the Clayton Act, the plaintiffs must include the risk of losing, and thereby not recovering any fees, in their evaluation of their suit's potential costs." *American Express III*, 667 F.3d at 218 (internal citations omitted). Therefore, because the class action waiver in this case effectively precludes Fromer from pursuing federal statutory remedies, the class arbitration waiver is void.

The arbitration agreement provides that "[i]f the class action waiver is found to be illegal or unenforceable, the entire Arbitration Provision will be unenforceable, and the dispute will be decided by a Court." Defs.' Mot. to Compel, Ex. D at 11. The arbitration agreement, therefore, is unenforceable with respect to the antitrust claims.

D. CUTPA Claim

Fromer has also alleged violations of CUTPA. Fromer argues that the arbitration agreement cannot be enforced with regards to his CUTPA claim for same reasons that his antitrust claim cannot be arbitrated; i.e., CUTPA depends upon the private cause of action for its enforcement, and those statutory rights contained within it cannot be vindicated without the availability of class actions. Fromer's argument, however, misses the most crucial distinction between the CUTPA claim and the antitrust claim: CUTPA is a state statute, while the Sherman Act is a federal statute.

In *Concepcion*, the Supreme Court held that the FAA preempted state law that, in effect, required the availability of class-wide arbitration. 131 S. Ct. at 1748. In *American Express III*, the Second Circuit made clear that its holding was not precluded by *Concepcion*, because

*Concepcion* had not addressed "whether a class-action arbitration waiver clause is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement would be to preclude their ability to vindicate their <u>federal</u> statutory rights." 667 F.3d at 212 (emphasis added). The Second Circuit then engaged in a lengthy discussion about the necessity of vindicating federal statutory rights. The Court concluded, "[e]radicating the private enforcement component from our antitrust law scheme cannot be what Congress intended when it included strong private enforcement mechanisms and incentives in the antitrust statutes." *Id.* at 218.

Judge Pooler, the author of *American Express III*, emphasized in her concurrence to the denial of the rehearing en banc that the distinction between *Concepcion* and *American Express III* was that the former dealt with state law, while the latter dealt with federal statutory law. "While *Concepcion* addresses state contract rights, *Amex III* deals with federal statutory rights – a significant distinction." *In re American Express Merchants' Litig.*, 681 F.3d 139, 140 (2d Cir. 2001) (Pooler, J., concurring). She continued,

> Because its analysis focused wholly on the issue of preemption of state law by federal law, *Concepcion* is silent on the holdings of the Court's earlier cases which enforce arbitration clauses only when those clauses permit parties to effectively vindicate their federal statutory rights.
>
> In stark contrast, *Amex III* raises a different issue: whether the FAA always trumps rights created by a competing federal statute, as opposed to rights existing under a common law of unconscionability. At issue here is not the right to proceed as a class, but the ability to effectively vindicate a federal statutory right that predates the FAA.

*Id.* The reasoning in *American Express III* does not apply to the CUTPA claim, and the inability to vindicate that statutory right does not provide a basis for the arbitration agreement unenforceable with regard to that claim.

Fromer also argues that the CUTPA claim should not be arbitrated because the demise of the class action waiver with regard to the antitrust claim leads to the demise of the arbitration

agreement as a whole.  In support, he points to the language of the arbitration agreement, which provides: "[i]f the class action waiver is found to be illegal or unenforceable, the entire Arbitration Provision will be unenforceable, and the dispute will be decided by a court."  Defs.' Mot. to Compel, Ex. D at 11.

Comcast argues that this clause does not destroy arbitration for the CUTPA claim, because the class action waiver has only been deemed unenforceable with regards to the antitrust claim.  In other words, the question is whether the arbitration agreement was intended to stand and fall with respect to each claim, or with respect to each lawsuit.

Under the arbitration agreement, a "dispute" is defined as:

> [A]ny dispute, claim or controversy between you and Comcast regarding any aspect of your relationship with Comcast that has accrued or may thereafter accrue, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence or any other intentional tort), or any other legal or equitable theory.

Defs.' Mot. to Compel, Ex. D at 9.  The breadth of that definition suggests that a "dispute" is more akin to a lawsuit than a claim.  It is also difficult to imagine that the parties intended to pursue analogous claims in both federal court and arbitration.  Such a strategy would be inefficient, wasteful, and duplicative.  Thus, because the class action waiver was found to be unenforceable with regard to the antitrust claim, "the entire Arbitration Provision [is] unenforceable."

### III. Conclusion

For the reasons stated above, I **DENY** the defendants' motion to compel arbitration, doc. 57.  It is so ordered.  Dated at Bridgeport, Connecticut, this 21st day of August 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge